IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:16-CV-00861

| | |
|---|---|
| ROBERT C. BARCHIESI and LEJLA HADZIC, Individually and in a representative capacity on behalf of a class of all persons similarly situated, <br><br>**Plaintiffs,** <br><br>v. <br><br>CHARLOTTE SCHOOL OF LAW, LLC and INFILAW CORPORATION, <br><br>**Defendants.** | **ORDER** |

This matter is before the Court upon Defendants' Motion to Dismiss, and Plaintiffs' Motion to Strike Portions of Defendants' Memorandum of Law in Support of Motion to Dismiss and Exhibits. This action is one of several filed against Charlotte School of Law, LLC ("CSL"), its parent corporation, and others after CSL was placed on probation by the American Bar Association ("ABA") in November of 2016 and CSL's access to federal student loan programs was revoked by the Department of Education ("DOE") in December of 2016.

I.    FACTUAL BACKGROUND

CSL was founded in 2006 and is one of three for-profit law schools owned by Defendant InfiLaw Corporation ("InfiLaw").[1] (Am. Compl. ¶12). The ABA is the accrediting agency for programs awarding a Juris Doctorate. (*Id.* at ¶14). The ABA promulgates Standards and Rules of Procedure for Approval of Law Schools ("Standards") with which law schools must comply in

---
[1] Plaintiffs originally sued InfiLaw's parent company, InfiLaw Holding, LLC, as well, who moved to dismiss for lack of personal jurisdiction. Plaintiffs thereafter voluntarily dismissed their claims against InfiLaw Holding.

1

order to obtain accreditation and remain in good standing. (*Id.* at ¶15). CSL was granted full ABA accreditation in 2011, at a time when its total enrollment was 481 students. (*Id.* at ¶¶21–22). Just three years later, in 2014, CSL's enrollment had ballooned to 1392 students. (*Id.*). In February of 2009, under the guidance and control of InfiLaw, CSL executed a Program Participation Agreement ("PPA"), allowing CSL to participate in student financial aid programs and making CSL students eligible for federal student loans. (*Id.* at ¶16). CSL's tuition and fees for the 2016–2017 academic year exceeded $44,000 for full-time students. (*Id.* at ¶20).

In March of 2014, an ABA "site team" visited CSL to conduct an evaluation of the school and met with InfiLaw president Rick Inatome and CSL's administration. (*Id.* at ¶25). CSL was provided with the ABA Inspection Report on September 15, 2014, and CSL responded to the Inspection Report in October of 2014. (*Id.* at ¶26). Following a January 2015 meeting, the ABA Accreditation Committee ("Committee") issued a decision ("First Decision") stating there was "reason to believe" that CSL had "not demonstrated compliance" with multiple ABA standards, and requested additional information to assess CSL's possible non-compliance with several other ABA Standards, including Standards 301(a),[2] 501(a),[3] 501(b),[4] and Interpretation 501-1.[5] (*Id.* at ¶27).

CSL provided additional information to the Committee in December of 2015. (*Id.* at

---

[2] Standard 301(a): "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical and responsible participation as members of the legal profession."
[3] Standard 501(a): "A law school shall maintain sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education."
[4] Standard 501(b): "A law school shall not admit an applicant who does not appear capable of satisfactorily completing its program of legal education and being admitted to the bar."
[5] Interpretation 501-1: "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."

2

¶29). On February 3, 2016, the Committee issued a decision ("Second Decision") determining CSL was "not in compliance" with Standards 301(a), 501(a), 501(b), and Interpretation 501-1, and specifically found:

> [CSL] has not demonstrated that it is maintaining a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession; maintaining sound admissions policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education; or is admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar.

(*Id.* at ¶30). The Committee also notified CSL that a hearing would be held in June of 2016 "to determine whether to impose sanctions in connection with [CSL's] noncompliance with the Standards." (*Id.* at ¶¶31–32). The Committee held a hearing on June 23, 2016, attended by CSL Dean Jay Conison and other CSL employees. (*Id.* at ¶36). In July, 2016, the Committee issued its last decision ("Third Decision"), again finding CSL was out of compliance with Standards 301(a), 501(a), 501(b), and Interpretation 501-1, describing CSL's noncompliance as "substantial and persistent," and held that CSL's plans for bringing CSL into compliance with the Standards "have not proven effective or reliable." (*Id.* at ¶37). The Third Decision instructed CSL to make remedial actions, supply additional information to the Committee, disclose the Third Decision to CSL's students and the public, and appoint a fact finder to review multiple issues, including CSL's admissions policies, academic rigor, bar examination results, student loan default rates, and graduate employment outcomes. (*Id.* at ¶38).

Defendants did not disclose the Third Decision to CSL's students or the public as ordered by the Committee. (*Id.* at ¶39). In August of 2016, CSL appealed portions of the Third Decision, but did not appeal the Committee's finding of noncompliance with Standards 301 and 501, and instead requested the requirement that CSL publicly disclose the findings of noncompliance be

3

eliminated. (*Id.* at ¶¶40–41). In support of their request, Jay Conison contended that if CSL publicly disclosed the Committee's findings of noncompliance, it would materially affect the decision of current and prospective students to attend CSL, in that many students and prospective students would decide not to attend CSL based upon the noncompliance. (*Id.* at ¶42).

On November 14, 2016, the ABA issued a decision entitled "Notice of Probation and Specific Remedial Action," concluding that CSL was still not in compliance with Standards 301(a), 501(a), 501(b), that the noncompliance was "substantial" and "persistent," and that CSL's plans to bring CSL into compliance "have not proven effective or reliable." (*Id.* at ¶43). CSL was placed on probation by the ABA and ordered to disclose its noncompliance for a second time. CSL was further ordered to publish information regarding its probationary status "prominently on its website." (*Id.* at ¶44).

Plaintiffs allege that Defendants continued to promote and maintain on CSL's website, during all relevant periods, that CSL was fully accredited by the ABA, and that CSL was found "in full compliance with ABA Standards." (*Id.* at ¶¶60–62). Defendants also represented on CSL's website, at all relevant times, that a "rigorous curriculum has been created to ensure that our students are equipped with practical skills that will allow them to thrive in a professional setting" despite the ABA's Second and Third Decisions that CSL was noncompliant with Standard 301(a) requiring CSL to "maintain a rigorous program . . . ." (*Id.* at ¶63).

Plaintiffs, former CSL students, filed their Complaint on December 22, 2016, on behalf of themselves and a class of similarly situated students, alleging causes of action under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), for Unjust Enrichment, Breach of Fiduciary Duty, and Constructive Fraud. Plaintiffs subsequently filed their First Amended Complaint, maintaining the same causes of action on behalf of an additional proposed class of

4

plaintiffs. Defendants have moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

## II. DISCUSSION

### A. Standard for 12(b)(6) Motions to Dismiss

To avoid dismissal, a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and to show that the claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" – a standard that requires more than facts "that are 'merely consistent with' a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. 662, 678. A court need not accept as true a plaintiff's "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citation and internal quotation marks omitted).

### B. Breach of Fiduciary Duty

Under North Carolina law, to state a claim for breach of fiduciary duty, a plaintiff must show that "(1) the defendant owed the plaintiff a fiduciary duty of care; (2) the defendant violated that duty; and (3) the breach of duty proximately caused the plaintiff's injury." *Marketel Media Inc. v. Mediapotamus, Inc.*, Nos. 13-cv-427, 13-cv-693, 2015 WL 2401001, at *7–8 (E.D.N.C. May 19, 2015); *see Green v. Freeman*, 749 S.E.2d 262, 268 (N.C. 2013). Defendants contend that Plaintiffs' claim must fail as they cannot establish the first element – the existence of a cognizable fiduciary relationship between themselves and Defendants.

The North Carolina Supreme Court has stated that a fiduciary relationship "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Abbitt v. Gregory*, 160 S.E. 896, 906 (N.C. 1931). Ordinarily, the existence or nonexistence of a fiduciary duty is dependent on the circumstances of each case and is generally a question of fact for the jury. *Stamm v. Salomon*, 551 S.E.2d 152, 158 (N.C. Ct. App. 2001), *rev. denied*, 560 S.E.2d 139 (N.C. 2002). Nevertheless, North Carolina courts have generally refused to recognize a fiduciary relationship as a matter of law in certain cases, such as cases between an employer and employee and between businesses with equal bargaining power negotiating at arm's length. *See McCants v. National Collegiate Athletic Ass'n*, 201 F. Supp. 3d 732 (M.D.N.C. 2016). Most importantly with regard to this case, courts applying North Carolina law have repeatedly rejected attempts to hold schools to a fiduciary standard vis-à-vis their students.[6] *See, e.g.*, *Ryan v. Univ. of N.C. Hosps.*, 609 S.E.2d 498, *4 (N.C. Ct. App. 2005) (rejecting the imposition of a fiduciary duty in the "academic setting"); *McCants*, 201 F. Supp. 3d at 749 (finding no fiduciary relationship exists because "North Carolina courts have been reluctant to extend the concept of fiduciary relationships to the academic setting"); *J.W. v.*

---

[6] Numerous courts throughout the country have likewise concluded a fiduciary relationship does not exist between schools and their students. *See, e.g.*, *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 716 (S.C. 2003) (recognizing that a relationship between a student and an academic advisor is not fiduciary in nature); *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 719 (D. Vt. 2012), *aff'd*, 570 F. App. 66 (2d Cir. 2014); *Leary v. Wesleyan Univ.*, No. CV055003943, 2009 WL 865679, at *12 (Conn. Super. Ct. Mar. 10, 2009); *Ho v. Univ. of Texas*, 984 S.W.2d 672, 693 (Tex. App. 1998); *see also Bradshaw v. Rawlings*, 612 F.2d 135, 140 (3d Cir. 1979) (determining that because society "considers the modern college student an adult," no specific duty of care will be found where "the circumstances show that the students have reached the age of majority and are capable of protecting their own self interests").

*Johnston Cty. Bd. of Educ.*, No. 5:11-CV-707-D, 2012 WL 4425439, at *14 (E.D.N.C. Sept. 24, 2012) (same).[7] Plaintiffs' attempts to distinguish these cases are unavailing.

In *Ryan*, the court explained that divided loyalties that are inherent to an academic setting preclude the imposition of a fiduciary duty:

> Although defendants were plaintiff's teachers and advisors, they also had to serve other interests. First, defendants had to serve the objectives of the institution by ensuring that its rules and regulations were followed. Second, defendants were required to protect the public by ensuring that only qualified doctors graduated from the program. Because defendants had divided loyalties, this case is unlike other fiduciary relationships in which the fiduciary must act primarily for the benefit of another.

609 S.E.2d at *4; *see McCants*, 201 F. Supp. 3d at 748–49 (concluding that divided loyalties preclude a fiduciary duty in "academic" context). Here, as in *Ryan*, CSL (and by extension, the other Defendants) could not possibly act exclusively for the benefit of Plaintiffs, because it simultaneously has loyalties to and must serve the interests and demands of many others, including the institution as a whole, the ABA, the North Carolina Board of Governors, and the public as an educator of individuals entering a licensed profession.

The absence of any North Carolina court decision extending a fiduciary duty to an academic context is fatal to the Plaintiffs' claim. *See McCants*, 201 F. Supp. 3d at 748–749 ("[A] federal court sitting in diversity, as this Court, cannot expand North Carolina law or policy 'farther than any North Carolina court has been willing to go.'" (citation omitted)). The court in *McCants* explained:

> Because North Carolina courts have been reluctant to extend the concept of fiduciary relationships to the academic setting, *see Ryan*, 2005 WL 465554, at *4, and without a clear signal that they are willing to do so, the Court cannot expand North Carolina law by concluding that Plaintiffs' Complaint plausibly alleges a fiduciary relationship between the NCAA and Plaintiffs.

---

[7] Plaintiffs' contention that Ryan is not binding because it is unpublished is irrelevant as both *McCants* and *J.W.* recognized and relied upon on *Ryan*. Regardless of whether it is technically binding in the precedential sense, it reflects North Carolina public policy and its reasoning is persuasive.

*Id.* The court in *J.W.* employed the same reasoning in its refusal to recognize a fiduciary duty between a special education student and school administration:

> *[P]laintiffs have not cited any North Carolina appellate opinions holding that a fiduciary relationship exists* in the middle school setting . . . . Because this court is analyzing North Carolina law under its supplemental jurisdiction, *this court may not expand North Carolina law to create a fiduciary duty.* . . .

2012 WL 4425439, at *15 (emphasis added). Accordingly, the Court concludes that Plaintiffs have failed to allege a plausible claim of breach of fiduciary duty and this claim must be dismissed.[8]

### C. Constructive Fraud

"To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction." *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 730 S.E.2d 763, 767 (N.C. Ct. App. 2012); *see Sterner v. Penn*, 583 S.E.2d 670, 674 (N.C. Ct. App.2003). As the Court has determined that Defendants do not owe Plaintiffs a fiduciary duty, Plaintiffs' claim for constructive fraud must likewise be dismissed.

### D. Unjust Enrichment

In Count 2 of their Amended Complaint, Plaintiffs allege that Defendants were unjustly enriched by the tuition and fees collected from Plaintiffs as a result of their misconduct, material representation and concealments. To plead unjust enrichment, a plaintiff must allege facts demonstrating: "(1) one party conferred a benefit upon the other party; (2) the benefit was not 'conferred officiously . . .'; (3) the benefit was not gratuitous; (4) the benefit was measureable;

---

[8] In their Amended Complaint, the Plaintiffs appear to allege that the PPA between CSL and the U.S. DOE somehow imposes a fiduciary duty. In their opposition brief, however, Plaintiffs abandon that argument.

and (5) the defendant consciously accepted the benefit." *Law Offices of John L. Juliano, P.C., v. Jensen*, 673 Fed. Appx. 291, 2016 WL 7240176, at *3 (4th Cir. Dec. 15, 2016) (applying North Carolina law); *see also JPMorgan Chase Bank, Nat'l Ass'n v. Browning*, 750 SE. 555, 559–60 (N.C. Ct. App. 2013). Plaintiffs have failed to state a plausible claim for unjust enrichment.

First of all, there is no claim for unjust enrichment where a benefit is given officiously, that is to say, without "solicit[ation] or induce[ment]." *Homeq v. Watkins*, 572 S.E.2d 871, 873 (N.C. Ct. App. 2002) ("Absent such inducement or solicitation, Defendants are simply not liable for unjust enrichment, even if they did benefit from [plaintiff]'s actions."); *Fireman's Fund Ins. Co. v. Safeco Ins. Co. of Am.*, No. 3:07-CV-86, 2007 WL 4233317, at *2 (W.D.N.C. Nov. 28, 2007) (dismissing unjust enrichment claim where plaintiff failed to allege that defendant "acted to induce or solicit [plaintiff's] actions"). Here, Plaintiffs do not allege that Defendants actively solicited their attendance. On the contrary, Plaintiffs state they "thoroughly reviewed" CSL's website, showing that they, on their own, sought out CSL. (Am. Compl. ¶¶ 70, 78.)

Secondly, a claim for unjust enrichment must plausibly allege that the enrichment was in fact "unjust." Logic dictates that payment of tuition and fees cannot be unjust if the students received the benefit of what they paid for. There are no allegations that the Defendants failed to provide classes in legal instruction, professors to teach those classes, or classrooms in which students could be taught. In short, the Plaintiffs paid for a legal education and they received a legal education in exchange for their tuition.[9] Any inquiry into the quality or value of the

---

[9] *See Gerboc v. ContextLogic, Inc.*, No. 1:16 CV 928, 2016 WL 6563684, at *6 (N.D. Ohio Nov. 4, 2016) (appeal filed Dec. 20, 2016) (dismissing unjust enrichment claim where Plaintiff paid the listed purchase price for speakers and received them even though defendant's "[w]ebsite, which made it appear as though [plaintiff] was getting a great deal, was fictitious" because plaintiff "received the benefit of what he paid for"); *Augustson v. Bank of Am., N.A.*, 864 F. Supp. 2d 422, 439 (E.D.N.C. 2012) (dismissing unjust enrichment claim where complaint did not "plausibly allege circumstances creating a legal or equitable

services provided in return for Plaintiffs' tuition and fees constitutes an impermissible foray into education malpractice.[10]

### E. Unfair and Deceptive Trade Practices

To prevail on a claim for unfair and deceptive trade practices, a claimant must show: "(1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused actual injury to claimant." *Marlen C. Robb & Son Boatyard & Marina, Inc. v. Vessel Bristol*, 893 F. Supp. 526, 540 (E.D.N.C. 1994); *Canady v. Mann*, 419 S.E.2d 597, 602 (N.C. Ct. App. 1992), *disc. rev. improvidently allowed*, 333 N.C. 569, 429 S.E.2d 348 (1993). North Carolina courts apply a three-factor analysis to determine the sufficiency of a claim under N.C. Gen. Stat. §75-1.1. *Furr v. Fonville Morisey Realty, Inc.*, 503 S.E.2d 401 (N.C. Ct. App. 1998). First, there must be a practice, act, or representation that falls within the broad definition of "unfair" or "deceptive." North Carolina courts generally have described a practice as "unfair" when it offends established public policy, or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *See Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 621 (N.C. 1980), *overruled on other grounds*, *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385 (N.C. 1988). An act or practice is "deceptive" if it has the tendency or capacity to deceive. *Johnson*, 266 S.E.2d at 622; *see also Norman v. Loomis Fargo & Co.*, 123 F. Supp. 2d 985, 989 (W.D.N.C. 2000) (quoting *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981)). Importantly, proof of actual deception is not required. *See Marshall*, 276 S.E.2d at 403. Even a truthful statement may be deceptive if it has the capacity or

---

obligation for [defendant] to account for a benefit" because "plaintiffs received the loan at the interest rate that each agreed to pay").

[10] North Carolina courts have repeatedly rejected any type of "educational malpractice" claim. *See McFadyen v. Duke Univ.*, 786 F.Supp. 2d 887, 982 (M.D.N.C. 2011), *aff'd in part, rev'd in part, dismissed in part sub nom. Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012).

tendency to deceive. *See Pearce v. American Defender Life Ins. Co.*, 343 S.E.2d 174, 180 (N.C. 1986).

North Carolina courts have traditionally applied this statute liberally, including claims involving negligent misrepresentation and failure to disclose material information. *See Gilbane Building Co. v. Federal Reserve Bank of Richmond*, 80 F.3d 895, 903 (4th Cir. 1996); *Kron Medical Corp. v. Collier Cobb & Assocs.*, 420 S.E.2d 192, 196 (N.C. Ct. App.), *disc. rev. denied*, 424 S.E.2d 910 (N.C. 1992). In essence, unfair and deceptive acts and practices can be explained as follows:

> A party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position. The concept of "unfairness" is broader than and includes the concept of deception. An act or practice is deceptive if it had the capacity or tendency to deceive. The facts surrounding the particular transaction and the impact the practice has in the marketplace determined whether a particular act is unfair or deceptive. Further, in determining whether a representation is deceptive, its effect on the average consumer is considered.

*Warfield v. Hicks*, 370 S.E.2d 689, 693 (N.C. Ct. App. 1988) (citations omitted).

Second, North Carolina courts require the act or practice to be in or affecting commerce – i.e., to have an impact on the marketplace. *See Miller v. Ensley*, 365 S.E.2d 11, 13 (N.C. Ct. App. 1988) ("N.C.Gen.Stat. § 75–1.1 [sic] states that 'unfair or deceptive acts or practices in or affecting commerce, are declared unlawful'" (quoting N.C. Gen. Stat. § 75-1.1 (2017)). "Commerce" is broadly defined in §75-1.1(b) as "all business activities, however denominated . . . ." N.C. Gen. Stat. § 75-1.1(b) (2017).

Third, and finally, North Carolina courts require the act or practice to have an "adverse impact on the individual or entity" in the form of actual damages. *Miller*, 365 S.E.2d at 14. Here, Plaintiffs allege that they were damaged by Defendants' unfair and deceptive conduct,

which unfairly and deceptively induced Plaintiffs and others similarly situated to attend CSL during the relevant time and pay tuition and fees to Defendants.

Equally as important as what *is* required for a valid claim for unfair or deceptive trade practices is what is *not* required. First, a Chapter 75 claim focuses exclusively on the conduct of defendant and the effect of that conduct upon commerce, and not the conduct of the plaintiff. Second, it is not necessary to show fraud, bad faith, or deliberate or knowing acts of deception, as scienter is not an element for a claim under the statute. *See Marshall v. Miller*, 276 S.E.2d 397 (N.C. 1981). Consequently, it is totally irrelevant whether Defendants made the misrepresentations negligently, in good faith, in ignorance of their falsity, and/or without intent to mislead. *Id.* at 403. What is relevant is the effect of the actor's conduct on the consuming public. *Wilder v. Squires*, 315 S.E.2d 63 (N.C. Ct. App.), *cert. denied*, 321 S.E.2d 158 (N.C. 1984); *see also Winston Realty Co. v. G.H.G., Inc.*, 320 S.E.2d 286, 290 (N.C. Ct. App.) ("If unfair trade practitioners could escape liability upon showing that their victims were careless, gullible or otherwise inattentive to their own interests the act would soon be a dead letter."), *aff'd*, 331 S.E.2d 677 (N.C. 1985).

The statute was intended to be a broad remedial act not subject to the onerous elements, nor the numerous defenses, of other remedies:

> Such legislation was needed because common law remedies have proved often ineffective. Tort actions for deceit in cases of misrepresentation involve proof of scienter as an essential element and were subject to the defense of "puffing." Proof of actual fraud involved a heavy burden of proof, including a showing of intent to deceive. Actions alleging breach of express and implied warranties in contracts also entailed burdensome elements of proof.

*Marshall*, 276 S.E.2d at 400 (citations omitted).

Defendants argue that Plaintiffs' UDTPA claim is essentially a fraud claim and must therefore satisfy the heightened pleading standards of Rule 9(b).[11] Defendants contend that Plaintiffs' claim fails to meet Rule 9(b)'s particularity requirement.[12]

Plaintiffs, on the other hand, dispute that this case is a common law fraud case. Plaintiffs contend that their claim encompasses numerous unfair and deceptive acts by Defendants, and when viewed as a whole, taking the factual allegations as true, the Amended Complaint clearly sets forth sufficient allegations of unfair and deceptive conduct by Defendants. In essence, the Amended Complaint alleges both a series of misleading and/or false statements, as well as concealment of the truth regarding CSL's noncompliance for nearly a year, all while students continued to enroll at CSL. The Amended Complaint alleges that Defendants executed a scheme of greed to enroll hundreds of students who failed to meet objective law school admission standards (Am. Compl. ¶¶21–24) thereby collecting millions of dollars in tuition and fees (*Id.* at ¶¶1, 16, 20, 22). As the inevitable implosion of the scheme unfolded, the ABA Committee following a "site team" visit in March of 2014 (*Id.* at ¶25), informed Defendants that there was "reason to believe" CSL had not demonstrated compliance" with multiple ABA Standards, and requested additional information concerning multiple accreditation standards for admissions, as well as rigor of educational programs. (*Id.* at ¶¶26–27). Defendants did not share that

---

[11] Defendants acknowledge that there is a split of authority as to whether Rule 9(b) applies to claims under the UDTPA. *Compare Topshelf Compare Topshelf Mgmt., Inc. v. Campbell-Ewald Co.*, 117 F.Supp. 3d 722, 727–32 (M.D.N.C. 2015) (applying Rule 9(b) to fraud-based UDTPA claims) *with CBP Res., Inc. v. SGS Control Servs., Inc.*, 394 F. Supp. 2d 733, 739 (M.D.N.C. 2005) (determining Rule 9(b) does not apply to fraud-based UDTPA claims).

[12] "To satisfy the specificity requirements of Rule 9(b), it is plaintiff's obligation to plead the time, place, and contents of the false representations, as well as the identity of the person making the representation and what such person obtained thereby. If such particularity is lacking, dismissal is proper." *Bishop v. Green Tree Serv., LLC*, No. 1:06CV355, 2007 WL 959524, at *9 (W.D.N.C. Mar. 28, 2007) (citing *Gant v. NCNB Nat'l Bank of N.C.*, 379 S.E.2d 865, 868 (N.C. Ct. App. 1989)).

information with CSL students. (*Id.* at ¶48). Instead students were told that CSL had received a "largely positive" report. (*Id.*).

CSL's noncompliance was confirmed by the ABA Committee on 3 February 2016 in its Second Decision (*Id.* at ¶¶30, 46), and subsequently found to be "substantial" and "persistent" in July of 2016 (*Id.* at ¶37). Defendants intentionally failed and refused to inform current and prospective students of their noncompliance, despite these adverse findings by the ABA and being ordered to do so by the ABA in July of 2016. (*Id.* at ¶¶38–39, 51–53) Plaintiffs contend that Defendants' refusal was, at a minimum, misleading, deceptive, and unfair. Defendants have admitted that disclosure would materially affect the decision of students to attend CSL. (*Id.* at ¶42)

Not only did Defendants conceal CSL's noncompliance from current and prospective students, Defendants simultaneously promoted and maintained on CSL's website, during all relevant periods, that CSL was fully accredited by the ABA, had been determined "in full compliance with the ABA Standards," and had "demonstrate[d] full compliance with each of the ABA's Standards,"(*Id.* at ¶¶54, 59–63), as well as representing that a "rigorous curriculum has been created to ensure that our students are equipped with practical skills that will allow them to thrive in a professional setting," despite the ABA's Second and Third Decisions finding CSL noncompliant with Standard 301(a) (requiring CSL to "maintain a rigorous program of legal education that prepared its students, upon graduation, for admission to the bar and for effective, ethical and responsible participation as members of the legal profession.") (*Id.* at ¶¶46, 63). Plaintiffs assert that these statements were, at a minimum, highly misleading, deceptive, and unfair.

Finally, the ABA issued a decision on November 14, 2016 entitled Notice of Probation and Specific Remedial Action, concluding again that CSL was not in compliance with ABA Standards, the issues were "substantial and have been persistent," and CSL's plans to bring CSL into compliance "have not proven effective or reliable." (*Id.* at ¶¶40–41, 43). CSL was placed on probation and ordered for a second time to inform students and the public of the ABA's decision (*Id.* at ¶44). While Defendants knew of CSL's noncompliance, Plaintiffs' allege that students were blindsided by ABA's November 2016 decision. If Defendants had not concealed CSL's noncompliance with multiple Standards from its students, Plaintiffs contend that they would not have attended CSL during the relevant time and Defendants would not have collected tuition and fees. (*Id.* at ¶¶73–74).

In their Amended Complaint, Plaintiffs allege multiple specific acts and omissions by Defendants that constitute unfair and deceptive trade practices. Taking these allegations as true, Plaintiffs have set forth abundant allegations of Defendants' unfair and deceptive conduct which denied Plaintiffs the ability to make an informed decision, and led Plaintiffs to erroneously believe CSL was in full compliance with ABA Standards, all done by Defendants to induce attendance at CSL. Moreover, the omissions are not limited to failing to disclose "insufficiently demanding admission standards" and the lack of a "rigorous curriculum," (Defs.' Mem, p. 28), but that the ABA had repeatedly found CSL noncompliant with multiple Standards, and the information was never shared with students. (*See* Am. Compl. ¶¶52–53). The Court finds that at this early stage of the litigation, Plaintiffs have sufficiently pleaded unfair and deceptive conduct by Defendants.

The Plaintiffs have moved pursuant to Rule 12(f) to strike Exhibits 1, 4, 5 and 6 of Defendants' Memorandum of Law in Support of their Motion to Dismiss, as well as certain

passages in Defendants' Memorandum. The Court has reviewed the briefs and the materials at issue and finds that all the exhibits and statements to which Plaintiffs object are either judicially noticeable, referenced in or integral to the First Amended Complaint, or both.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss is hereby **GRANTED** as to Plaintiffs' claims for Breach of Fiduciary Duty, Constructive Fraud, and Unjust Enrichment, and **DENIED** as to Plaintiffs' claim for Unfair and Deceptive Trade Practices.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike Portions of Defendants' Memorandum of Law in Support of Motion to Dismiss and Exhibits is hereby DENIED.

Signed: August 17, 2017

Graham C. Mullen
United States District Judge